UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

CURTIS SHAFER, et al.,

                              Plaintiffs,

        v.

CITY OF BOULDER, et al.,

                              Defendants.

Case No. 2:10-cv-02228-MMD-GWF

**ORDER**

(Defendants' Motion for Summary
Judgment – dkt. no. 28)
(Plaintiffs' Motion for Summary
Judgment – dkt. no. 29)

**I.        SUMMARY**

        Before the Court are Defendants City of Boulder City ("COBC" or "City"), Chief
Thomas Finn, Deputy Chief/Sergeant John Chase, Detective Mark Dubois,[1] and COBC
Mayor Roger Tobler's Motion for Summary Judgment (dkt. no. 28), and Plaintiff Curtis
Shafer's Partial Motion for Summary Judgment (dkt. no. 29).[2]

**II.       BACKGROUND**

        Except where stated, the following facts appear without dispute in the summary
judgment record.  Plaintiff Curtis Shafer and his family moved to 1733 Red Mountain

_____

        [1]Collectively, this Order refers to the Officer Defendants, BCPD, and the City as
the "COBC Defendants."

        [2]Shafer filed suit on his behalf and on behalf of his three children.  However, both
parties' Motions for Summary Judgment focus on Shafer's claims on his own behalf.
Accordingly, unless otherwise stated, this Order discusses only Shafer's claims brought
on his own behalf.

1   Drive, Boulder City, Nevada on or about December 1, 2007.  His next-door neighbor was

2   Defendant Mark Fenyves.  Shafer rented the property from his parents.   Soon after

3   Shafer moved in, Fenyves began calling the Boulder City Police Department ("BCPD")

4   on a regular basis claiming that Shafer, Shafer's wife, and visitors at Shafer's home were

5   involved in the illegal sale and purchase of narcotics.  Shafer admits that both he and his

6   wife have used drugs in his residence, but denies that he was ever involved in the sale

7   or distribution of drugs during the relevant time period.  Instead, he states that the busy

8   foot traffic at his home was a result of him leaving his home open for friends and family

9   members to come and go as they please (dkt. no. 30-2 at 31).   And while Fenyves

10   believed that the nighttime antics at the Shafer home were suspicious, Shafer testified

11   that this late night activity was merely Shafer and his friends staying up late playing

12   video games.  (Dkt. no. 30-2 at 24.)

13        Yet Fenyves believed Shafer was involved in the sale of illegal narcotics, and to

14   that end he took several steps to report and monitor Shafer's activity. Fenyves

15   purchased a home video surveillance system with four video cameras, a digital video

16   recorder ("DVR"), and a split-screen television to monitor the cameras.  At the same

17   time, Fenyves told his neighbors about his suspicions and convinced several neighbors

18   to install video cameras on their properties in order to videotape the Shafer residence.

19   Shafer asserts that Fenyves and the cooperating neighbors agreed to maintain a list of

20   license plates of all visitors coming to and going from Shafer's home.  By early 2009, all

21   of Shafer's immediate neighbors had installed video cameras on their properties.  (Dkt.

22   no. 30 at 11.)  The record demonstrates that at least some of these cameras were aimed

23   at Shafer's home.  (*See id.*)  Shafer's neighbors repeatedly called the police to report on

24   the allegedly unsavory activity occurring at the Shafer residence.  Defendants claim that

25   while Fenyves' calls were the most numerous, several of Shafer's other neighbors also

26   called the Police Department with similar concerns.

27        After receiving repeated calls about the allegedly suspicious activity at 1733 Red

28   Mountain Drive, BCPD decided to conduct an investigation regarding the matter.   On

2

February 20, 2009, while Chief Finn, the Boulder City Chief of Police, was away at a training conference, Fenyves and a small group of Shafer's neighbors met with Deputy Chief Chase to discuss their concerns.  After the meeting, Deputy Chief Chase asked Detective Dubois to initiate a narcotics-related investigation of Shafer's home. (Dkt. no. 29-3 at 6.)  As part of that investigation, Chase directed Dubois to provide Fenyves with four infrared, long-range, weatherproof, silent video surveillance cameras. The Department of Homeland Security ("DHS") had provided BCPD with the cameras as part of a $50,000 grant to help the BCPD and Boulder City combat terrorism and criminal activity (the cameras are hereinafter referred to as the "DHS cameras").  (*See* dkt. nos. 29-1 at 1 and 30-5 at 7.)   At his deposition, Deputy Chief Chase stated that BCPD provided Fenyves with the DHS cameras to "monitor the ingress and egress into the [Shafer] property to see whether or not" criminal activity was occurring at the residence. (Dkt. no. 30-3 at 22.)

The DHS cameras were installed and operated day and night for fifty-six days.  At least two of the cameras were pointed at Shafer's property – one at his bathroom window and one at his backyard.  According to the COBC Defendants, Detective Dubois did not install the cameras, but instead instructed Fenyves on the placement of the cameras.  Dubois testified that he told Fenyves it would "be okay" if the cameras were pointed in the direction of Shafer's backyard, but not to point the cameras at any of Shafer's windows.  (Dkt. no. 30-5 at 9.)  Fenyves, however, testified that none of the Officer Defendants provided him with instructions about installation or filming.  (Dkt. no. 29-6 at 8-10.)

Although Chief Finn was out of town when Deputy Chief Chase authorized the investigation and loaned the cameras to Fenyves, Finn and Chase spoke about the investigation upon Finn's return.  Chase informed Finn that BCPD had loaned Fenyves the DHS cameras as part of an investigation into the allegedly suspicious activity at the Shafer residence.

///

Shafer claims that he complained to the police at least nineteen times about his neighbors' surveillance of his home.  There is no evidence that the police responded to these calls.  But on April 4, 2009, Officer Jeanette Ford was dispatched to Fenyves' home to resolve a dispute that arose between Shafer and Fenyves.  Fenyves had positioned one of the DHS cameras on a pole so that it could directly overlook Shafer's backyard and a portion of Shafer's home.  Angered by this, Shafer walked onto Fenyves' property and tried to knock the camera down.   At approximately 11:30 p.m., Officer Ford reported to the scene.  The incident report listed both Fenyves and Shafer as reporting parties and was originally reported as an assault and battery.  (Dkt. no. 34 at 10.) However, in her report Officer Ford noted that there were no signs of assault and battery but merely a trespass.  Officer Ford's report states that she spoke with both parties about the incident.  Officer Ford noted that "Mark [Fenyves] was very vague about how he obtained the camera and eventually said he was provided with it by then Deputy Chief J. Chase . . . with the intent being to film Curtis' [Shafer] backyard and the activity going on at his home as there were concerns of illegal narcotic activity possibly occurring."  (Dkt. no. 34 at 10.)   Officer Ford informed Fenyves that he had not positioned the camera on the pole properly and that he must take it down.  (*Id; see also* dkt. no. 30 at 25.)  Fenyves complied.  Approximately two weeks later, after speaking with the BCPD about the incident, Fenyves returned all four cameras to the BCPD.

Discord between the two neighbors persisted.  The parties participated in neighborhood mediation in April 2009.  Although at first the results appeared promising – with Fenyves and Shafer hugging in reconciliation – the peace did not last long.  Both men received temporary restraining orders against one another.  (Dkt. no. 30-2 at 27.) Several media stories covered the allegedly illicit activity at the Shafer residence.  (*Id.* at 29.)  The animosity led Mayor Roger Tobler to call a special town meeting on January 19, 2010. Shafer asserts that at the meeting, Mayor Tobler "opined that he had knowledge of the neighborhood and the problem and that Plaintiff was the cause."  In fact, Tobler stated, "I wouldn't want to live next to that [Shafer] either."

1    Shafer did not discover that BCPD had provided Fenyves with the DHS cameras

2    until September 16, 2010.  (*See* dkt. no. 28-5 at 37.)  A criminal complaint had been

3    issued against Shafer for trespassing on Fenyves' property on April 4, 2009, the night of

4    the incident involving Officer Ford.  During the municipal court trial on September 16,

5    2010, Deputy Chief Chase and Detective Dubois testified that the BCPD had provided

6    Fenyves with the DHS cameras as part of an initial narcotics investigation.[3]  (Dkt. no. 28-

7    5 at 20, 37.)

8        On December 22, 2010, Shafer filed suit against the City, BCPD, Chief of Police

9    Thomas Finn, Deputy Chief of Police John Chase, and Senior Detective Mark Dubois

10   under 42 U.S.C. § 1983 for violation of his Fourth Amendment right to be secure against

11   unreasonable government searches.  He brings suit against the officers in their individual

12   and official capacities.  Shafer also brings a *Monell* claim against the City and BCPD,

13   alleging that they perpetuated a policy, practice, or custom of unconstitutional video

14   surveillance of Shafer's home.

15       Shafer also brings several state law claims against the COBC Defendants,

16   including: (1) violation of Nevada Constitution Article I, § 18; (2) invasion of privacy; (3)

17   intentional infliction of emotional distress; (4) negligent infliction of emotional distress; (5)

18   civil conspiracy; (6) negligence; and (7) slander against Mayor Tobler.[4]

19       The COBC Defendants filed a Motion for Summary Judgment on all claims except

20   for Shafer's Nevada Constitution claim.[5]  (Dkt. no. 28.)  Shafer filed a Motion for Partial

21   Summary Judgment on all claims except for intentional infliction of emotional distress,

22

23   _____

       [3]At the trial, Shafer also learned that the video surveillance tapes had been
24   destroyed, damaged, or lost by the BCPD.  (Dkt. no. 28-5 at 37.)

25       [4]Shafer is also suing Fenyves, who is not affiliated with the COBC Defendants
     and is not a party to any motions discussed in this Order.

26       [5]Though Defendants call their pleading a "motion for summary judgment," the
27   parties do not address Shafer's allegations regarding his Nevada Constitution claim in
     their Motion. This Order only addresses those claims specifically addressed by the
28   parties.

1  negligent infliction of emotional distress, and his claims relating to Defendants Tobler
2  and Fenyves. (Dkt. no. 29.)

3  **III.    SUMMARY JUDGMENT STANDARD**

4          The purpose of summary judgment is to avoid unnecessary trials when there is no
5  dispute as to the facts before the court.  *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18
6  F.3d 1468, 1471 (9th Cir. 1994).  Summary judgment is appropriate when the pleadings,
7  the discovery and disclosure materials on file, and any affidavits "show there is no
8  genuine issue as to any material fact and that the movant is entitled to judgment as a
9  matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986).  An issue is "genuine"
10 if there is a sufficient evidentiary basis on which a reasonable fact-finder could find for
11 the nonmoving party and a dispute is "material" if it could affect the outcome of the suit
12 under the governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).
13 Where reasonable minds could differ on the material facts at issue, however, summary
14 judgment is not appropriate.  *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir.
15 1995).  "The amount of evidence necessary to raise a genuine issue of material fact is
16 enough 'to require a jury or judge to resolve the parties' differing versions of the truth at
17 trial.'"  *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (9th Cir. 1983) (quoting *First Nat'l*
18 *Bank v. Cities Service Co.*, 391 U.S. 253, 288-89 (1968)).  In evaluating a summary
19 judgment motion, a court views all facts and draws all inferences in the light most
20 favorable to the nonmoving party.  *Kaiser Cement Corp. v.  Fishbach & Moore, Inc.*, 793
21 F.2d 1100, 1103 (9th Cir. 1986).

22         The moving party bears the burden of showing that there are no genuine issues
23 of material fact.  *Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir. 1982).  "In
24 order to carry its burden of production, the moving party must either produce evidence
25 negating an essential element of the nonmoving party's claim or defense or show that
26 the nonmoving party does not have enough evidence of an essential element to carry its
27 ultimate burden of persuasion at trial."  *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210
28 F.3d 1099, 1102 (9th Cir. 2000).   Once the moving party satisfies Rule 56's

1   requirements, the burden shifts to the party resisting the motion to "set forth specific

2   facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.  The

3   nonmoving party "may not rely on denials in the pleadings but must produce specific

4   evidence, through affidavits or admissible discovery material, to show that the dispute

5   exists," *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991), and "must do

6   more than simply show that there is some metaphysical doubt as to the material facts."

7   *Orr v. Bank of Am.*, 285 F.3d 764, 783 (9th Cir. 2002) (internal citations omitted).  "The

8   mere existence of a scintilla of evidence in support of the plaintiff's position will be

9   insufficient." *Anderson*, 477 U.S. at 252.

10       Further, "when parties submit cross-motions for summary judgment, '[e]ach

11  motion must be considered on its own merits.'"  *Fair Hous. Council of Riverside County,*

12  *Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (quoting William W.

13  Schwarzer, et al., *The Analysis and Decision of Summary Judgment Motions*, 139 F.R.D.

14  441, 499 (Feb. 1992) (citations omitted).  "In fulfilling its duty to review each cross-motion

15  separately, the court must review the evidence submitted in support of each cross-

16  motion." *Id.*

17

18  **III.    CROSS-MOTIONS FOR SUMMARY JUDGMENT ON PLAINTIFF'S 42 U.S.C.**
     **§ 1983 CLAIMS**

19       The parties are seeking summary judgment on Shafer's § 1983 claims.  The Court

20  addresses the cross-motions on these claims collectively.

21       **A.        42 U.S.C. § 1983 Legal Standard**

22       42 U.S.C. § 1983 provides a mechanism for the private enforcement of

23  substantive rights conferred by the Constitution and federal statutes.  *Graham v. Connor*,

24  490 U.S. 386, 393-94 (1989).  Section 1983 "'is not itself a source of substantive rights,'

25  but merely provides 'a method for vindicating federal rights elsewhere conferred.'"

26  *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137,

27  144 n.3 (1979)).  To state a claim under § 1983, a plaintiff "must allege the violation of a

28  right secured by the Constitution and the laws of the United States, and must show that

7

1   the alleged deprivation was committed by a person acting under color of law."  *West v.*

2   *Atkins*, 487 U.S. 42, 48-49 (1988).  Here, Shafer relies on substantive rights conferred by

3   the Fourth Amendment.

4
5         **B.**    **Fourth Amendment Claims Against Defendants Chase and Dubois in their Individual Capacities**

6             **1.**    **Violation of the Fourth Amendment**

7         Shafer asserts that the video surveillance of his backyard and bathroom window

8   violates his Fourth Amendment right to be free from an unreasonable search.  The Court

9   agrees and grants partial summary judgment in Shafer's favor regarding his Fourth

10  Amendment claim against Defendants Chase and Dubois.

11        "At the very core of the Fourth Amendment stands the right of a man to retreat

12  into his own home and there be free from unreasonable governmental intrusion."  *Kyllo*

13  *v. United States*, 533 U.S. 27, 31 (2001) (citations and quotation marks omitted).  "With

14  few exceptions, the question whether a warrantless search of a home is reasonable and

15  hence constitutional must be answered no."  *Id.* (citations omitted).  "On the other hand,

16  the antecedent question whether or not a Fourth Amendment 'search' has occurred is

17  not so simple . . . ."  *Id.* at 31.

18        With these principles in mind, the Court considers whether (1) Shafer's backyard

19  constitutes the curtilage of his home, and is therefore entitled to the heightened Fourth

20  Amendment protection traditionally afforded to the home; and (2) whether the video

21  surveillance of Shafer's backyard constituted a "search" under the Fourth Amendment.

22        As an initial matter, Defendants argue that Fenyves disregarded Detective

23  Dubois' instructions about the placement and directioning of the DHS cameras, and that

24  this precludes the Officer Defendants from being held liable for the surveillance of

25  Shafer's home.  Defendants appear to argue that Officer Dubois instructed Fenyves not

26  to tape Shafer's home, but to tape Fenyves' own property, because Fenyves had told

27  the police that individuals were mistaking his property for Shafer's and coming onto his

28  property inquiring about purchasing narcotics.  (Dkt. no. 30 at 13.)   However, testimony

provided by both Officers at their depositions directly contradicts this argument. Detective Dubois testified that he told Fenyves it would "be okay" if the cameras were pointed in the direction of Shafer's backyard, but not to point the cameras at any of Shafer's windows.  (Dkt. no. 30-5 at 9.)  Moreover, Deputy Chief Chase testified that he understood Fenyves would use the DHS cameras to videotape Shafer's backyard, because the "backyard where people were coming in and out of the gate was an area of interest."  (Dkt. no. 29-3 at 7.)

Based on this testimony, it is undisputed that Officers Chase and Dubois authorized Fenyves to film Shafer's backyard which, as explained below, constitutes the curtilage of Shafer's home and is subject to heightened Fourth Amendment protection.

There is, however, a genuine issue of material fact as to whether the Officers authorized taping Shafer's bathroom window.  Detective Dubois testified that he told Fenyves not to film Shafer's bathroom window.  (Dkt. no. 30-5 at 9.)  Fenyves, however, testified that he did not receive instructions on what he was authorized to film with the DHS cameras.  (Dkt. no. 29-6 at 8-10.)  While this issue is of no import for determining whether Officers Chase and Dubois violated Shafer's Fourth Amendment rights, it may be relevant at a later point in this litigation if part of Shafer's asserted damages arise out of Fenyves' filming his bathroom window. The Court accordingly denies summary judgment for both parties on Shafer's Fourth Amendment claims as it relates to Shafer's allegation that Officers Chase and Dubois authorized or knew that Fenyves was filming Shafer's bathroom window.

### a.    Whether Plaintiff's Backyard Constitutes the Curtilage of his Home

The "search of [a] backyard is subject to the Fourth Amendment's privacy protections.  Both 'the home and its traditional curtilage [are] given the highest protection against warrantless searches and seizures.'"  *United States v. Romero-Bustamente*, 337 F.3d 1104, 1107 (9th Cir. 2003) (quoting *United States v. Warner*, 843 F.2d 401, 405 (9th Cir. 1988)).  "At common law, the curtilage is the area to which extends the intimate

activity associated with the 'sanctity of a man's home and the privacies of life,' *Boyd v. United States*, 116 U.S. 616, 630 (1886), and therefore has been considered part of the home itself for Fourth Amendment purposes." *Romero-Bustamante*, 337 U.S. at 1107.

To determine whether a plaintiff's backyard constitutes the curtilage of the home, courts employ a four-factor test first articulated in *United States v. Dunn*, 480 U.S. 294, 301 (1987). Courts consider (1) "the proximity of the area claimed to be curtilage to the home"; (2) "whether the area is included within an enclosure surrounding the home"; (3) "the nature of the uses to which the area is put"; and (4) "the steps taken by the resident to protect the area from observation by people passing by." *Id.* These factors "cannot be mechanically applied, but are merely useful analytical tools to determine whether an area is to be protected from unconstitutional searches and seizures." *Id.*

The parties do not dispute that the area in question is directly outside Shafer's home. It is surrounded by a solid-paneled, four-to-five foot high wooden fence. (Dkt. no. 30-2 at 37.) Further, Shafer made significant attempts to protect his backyard from observation from people passing by and from his neighbors, especially Fenyves. Shafer called the police when Fenyves first put up his personal cameras and began recording Shafer in January 2009. (Dkt. no. 30-2 at 23.) Shafer asked Fenyves to take down his cameras multiple times. (*Id.*) Shafer even added additional feet of plywood to his backyard fence in an attempt to block the cameras on Fenyves' property that were peering into Shafer's bathroom window. (Dkt. no. 30-2 at 14.) Thus, although his home was under constant video observation on all sides, Shafer never consented to such surveillance. For these reasons, Shafer's backyard constitutes the curtilage of his home. *See also, e.g., United States v. Romero-Bustamante*, 337 F.3d 1104, 1108 (9th Cir. 2003) (a backyard that was "small, enclosed, adjacent to [the] house, and located behind [the] house" constituted the curtilage of the home). Therefore, the video surveillance of Shafer's backyard is afforded the heightened Fourth Amendment protection traditionally given to the home.

///

1

**b.      Whether the Video Surveillance of Plaintiff's Backyard
Constitutes a Search**

2      The Court next considers whether Fenyves' fifty-six day round-the-clock video

3   surveillance of Shafer's backyard on behalf of the BCPD violated the Fourth

4   Amendment's protection against unreasonable government searches.

5       "The touchstone of Fourth Amendment analysis is whether a person has a

6   'constitutionally protected reasonable expectation of privacy.'" *California v. Ciraolo*, 476

7   U.S. 207, 211 (1986) (quoting *Katz v. United States*, 389 U.S. 347, 360 (Harlan, J.,

8   concurring)). "*Katz* posits a two-part inquiry: first, has the individual manifested a

9   subjective expectation of privacy in the object of the challenged search? Second, is

10   society willing to recognize that expectation as reasonable?" *Ciraolo*, 476 U.S. at 211

11   (citing *Smith v. Maryland*, 442 U.S. 735, 740 (1979)).

12      Defendants' primary argument is that Shafer had neither a subjective nor

13   objective expectation of privacy because before Fenyves installed the DHS cameras, all

14   of Shafer's surrounding neighbors were already filming him twenty-four hours a day,

15   seven days a week. Therefore, the argument goes that Shafer had no *subjective*

16   expectation of privacy because he was constantly on camera, and it is *objectively*

17   *unreasonable* for someone who was under constant video surveillance to expect any

18   privacy in his home.

19   **i.      Subjective Expectation of Privacy**

20      "The *Katz* test – whether the individual has an expectation of privacy that society

21   is prepared to recognize as reasonable – has often been criticized as circular, and hence

22   subjective and unpredictable." *Kyllo*, 533 U.S. at 34.    Perhaps playing to this,

23   Defendants make the inherently circular argument that Shafer must have understood

24   that the DHS cameras, just like the cameras already surrounding his home from all

25   sides, would capture his every move; he simply could not expect otherwise.  However,

26   Shafer was not a willing participant in the neighborhood's video surveillance of his home.

27   He had tried many times to have his neighbors take down their cameras.  When those

28   attempts failed, Shafer took efforts to avoid being taped.  He tried not to spend much

1    time outside and stayed away from his windows.  (*See* dkt. no. 30-2 at 40.)  Shafer's

2    actions demonstrate that he was fastidiously attempting to retain what privacy remained

3    in his home and regain the privacy he had lost.

4        Even were the Court to give merit to Defendants' circuitous argument, the type of

5    surveillance Shafer was subjected to before Fenyves installed the DHS cameras is

6    distinct from the government surveillance challenged here.  Shafer *did* know that his

7    neighbors were nosy, suspicious, and constantly videotaping him and his home.  But

8    Shafer *did not* know that Fenyves was acting as an agent of the BCPD and taping his

9    every move for two months as part of the BCPD's narcotics investigation. The

10   government cameras were hidden amongst the other cameras. This type of hidden video

11   surveillance "is one of the most intrusive investigative mechanisms available to law

12   enforcement."  *United States v. Nerber*, 222 F.3d 597, 603 (9th Cir. 2000).

13       For the above reasons, the Court concludes that Shafer had a subjective

14   expectation in the privacy of his home.

### ii.    Objective Expectation of Privacy

16       The second prong of the *Katz* test considers the objective reasonableness of a

17   plaintiff's subjective expectation of privacy.  This reasonableness inquiry is central to any

18   Fourth Amendment analysis because the Amendment "reflects a choice that our society

19   should be one in which citizens dwell in reasonable security and freedom from

20   surveillance." *Ciraolo*, 476 U.S. at 217 (citations omitted).

21       Defendants argue that society does not recognize as reasonable an expectation

22   of privacy from constant government video surveillance of one's home.  Defendants cite

23   *California v. Ciraolo* to support their argument.  In *Ciraolo*, the Supreme Court held that

24   the warrantless aerial observation of a fenced-in backyard within the curtilage of the

25   suspect's home was reasonable under the Fourth Amendment.  476 U.S. at 214.  There,

26   police officers received a tip that Ciraolo was growing marijuana in his backyard.  *Id.* at

27   209.  Unable to see over his backyard fence, the officers secured a private plane, flew it

28   over Ciraolo's home, and identified and photographed marijuana plants growing in

1    Ciraolo's backyard. *Id.* The Court held that Ciraolo did not have a reasonable

2    expectation of privacy in his backyard from this type of search because it was a

3    physically nonintrusive observation, which "any member of the public flying in [the]

4    airspace who glanced down could have seen . . . ." *Id.* at 213.

5         Yet while the *Ciraolo* Court held that the aerial visual surveillance of the suspect's

6    home was not a search, it also noted that the Fourth Amendment's safeguard against

7    unreasonable searches is not solely applicable to physical intrusions onto private

8    property. *Ciraolo*, 476 U.S. at 214. The Court referenced Justice Harlan's concurrence

9    in *Katz*, which raised concerns about "future electronic developments and the potential

10   for electronic interference with private communications." *Id.* (citing *Katz*, 389 U.S. at

11   362). The Court reasoned that Justice Harlan would not consider an aircraft to be "within

12   the category of future 'electronic' developments that could stealthily intrude upon an

13   individual's privacy," but at the same time gave credence to arguments that certain

14   electronic equipment could fall into this category. *Id.* at 215. Later decisions from

15   several circuit courts demonstrate that the continuous video surveillance of Shafer's

16   home falls into this category.[6]

17        In *United States v. Cuevas-Sanchez*, 821 F.2d 248 (5th Cir. 1987), the Fifth

18   Circuit held that "the installation of a surveillance camera on a power pole to videotape

19   activities in a suspect's backyard constitutes a 'search' within the meaning of the Fourth

20   Amendment." *Nerber*, 222 F.3d at 601 (citing *Cuevas-Sanchez*, 821 F.2d at 251). The

21   court held that such surveillance "provokes an immediate negative and visceral reaction:

22   indiscriminate video surveillance raises the spectre of the Orwellian state." *Cuevas-*

23   *Sanchez*, 821 F.2d at 251. The *Cuevas-Sanchez* court distinguished that case from

24

25        [6]Defendants also cite to *United States v. Taketa*, 923 F.2d 665, 677 (9th Cir.

26   1991) for the proposition that "[v]ideo surveillance does not in itself violate a reasonable
     expectation of privacy . . . the police may record what they normally may view with the

27   naked eye." However, this quote misconstrues *Taketa*, which noted that although not *all*
     video surveillance violates a plaintiff's reasonable expectation of privacy, persons may

28   create "zones of privacy within which they may not reasonably be videotaped." *Id.*

1   *Ciraolo*, noting that video surveillance "is not a one time overhead flight or a glance over

2   the fence by a passer-by . . . [defendant] Cuevas's expectation to be free from this type

3   of video surveillance in his backyard is one that society is willing to recognize as

4   reasonable." *Id.*

5       The Ninth Circuit referenced *Cuevas-Sanchez* with approval in *Nerber*. 222 F.3d

6   at 603. There, the government secretly videotaped a hotel room drug deal involving the

7   defendants and government informants. *Id.* at 599. The *Nerber* court held that

8   defendant drug dealers had a reasonable expectation of privacy in their hotel room

9   except during those periods in which government informants were in the room. *Id.* at

10  604. The court noted that "the sweeping, indiscriminate manner in which video

11  surveillance can intrude upon us, regardless of where we are, dictates that its use be

12  approved only in limited circumstances." *Id.* at 603; *see also United States v.*

13  *Koyomejian*, 970 F.2d 536, 551 (9th Cir. 1992) ("every court considering the issue has

14  noted [that] video surveillance can result in extraordinarily serious intrusions into

15  personal privacy . . . . If such intrusions are ever permissible, they must be justified by

16  an extraordinary showing of need.").[7]

17      *Nerber* definitively held that society recognizes as reasonable an expectation that

18  one's home will not be the subject of unwarranted government video surveillance. 222

19  F.3d at 603-04. Accordingly, Shafer had a reasonable expectation of privacy here. He

20  was under constant video surveillance for fifty-six days. During that time, Fenyves, on

21  behalf of the government, was able to turn on his television and watch everything going

22  on in portions of Shafer's backyard, night and day. In light of the Fourth Amendment

23  principles articulated in *Nerber*, this Court cannot condone the invasive, imposing

24  government surveillance conducted here.

25  ///

26

27      [7]Other circuits are in accord with the Fifth and the Ninth on this issue. *See, e.g.,*
    *United States v. Mesa-Rincon*, 911 F.2d 1433, 1422 (10th Cir. 1990); *United States v.*
28  *Torres*, 751 F.2d 875, 882 (7th Cir. 1984).

1    Importantly, it was not only omnipresence and lengthy duration of the surveillance

2    that intruded upon Shafer's expectation of privacy in his home, but also the intensity of

3    the surveillance.  The DHS cameras provided to Fenyves were long-range, infrared,

4    heavy-duty, waterproof, daytime/nighttime cameras, purchased as part of a $50,000

5    Department of Homeland Security grant to combat terrorism and similar criminal activity.

6    The DHS cameras undoubtedly contained superior video-recording capabilities than a

7    video camera purchased from a department store.  As such, this case presents similar

8    facts to cases where "the Government uses a device that is not in general public use[] to

9    explore details of a home that would previously have been unknowable without physical

10   intrusion." *See Kyllo*, 533 U.S. at 40.   Therefore, like in those cases, "the surveillance is

11   a 'search' and is presumptively unreasonable without a warrant."  *See id.*

12                    **2.    Qualified Immunity**

13        Defendants argue that even if Officers Chase and Dubois' conduct violated

14   Shafer's Fourth Amendment right to be free from an unreasonable search, the doctrine

15   of qualified immunity shields them from liability.

16        Where a plaintiff has stated a valid cause of action under § 1983, government

17   officials sued in their individual capacities may raise the affirmative defense of qualified

18   or absolute immunity.[8]   *See Spoklie v. Montana*, 411 F.3d 1051, 1060 (9th Cir. 2005).

19   The doctrine of qualified immunity protects government officials "from liability for civil

20   damages insofar as their conduct does not violate clearly established statutory or

21   constitutional rights of which a reasonable person would have known."   *Harlow v.*

22   *Fitzgerald*, 457 U.S. 800, 818 (1982).  This immunity is granted broadly and "provides

23

24        [8]In *Saucier v. Katz*, 533 U.S. 194, 201 (2001), the Supreme Court mandated a
25   two-step sequence for resolving qualified immunity claims: first, determine whether the
     defendant violated the plaintiff's constitutional right, and second, determine whether that
26   right was "clearly established" at the time of defendant's alleged misconduct.  However,
     the Supreme Court recently held that the *Saucier* protocol is no longer mandatory.
27   *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  The Supreme Court left the order of
     decision to the "sound discretion" of district court judges.  *Id.*  The Court chooses to
28   follow the *Saucier* protocol in this case.

ample protection to all but the plainly incompetent or those who knowingly violate the law." *Moran v. Washington*, 147 F.3d 839, 844 (9th Cir. 1998) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).  "When a law enforcement officer asserts qualified immunity from liability for Fourth Amendment violations, the district court must determine whether, in light of clearly established principles governing the conduct in question, the officer objectively could have believed that his conduct was lawful."  *Watkins v. City of Oakland, Cal.*, 145 F.3d 1087, 1092 (9th Cir. 1998).

"Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  "[Q]ualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact."  *Id.* (citations omitted).  Qualified immunity shields government officials from "civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated."  *Anderson v. Creighton*, 483 U.S. 635, 638 (1987) (citations omitted).

Because the Court has determined that Defendants Chase and Dubois violated Shafer's Fourth Amendment right to be free from government video surveillance of his home, the remaining question is whether the right was clearly established at the time of the violation.  *See Saucier v. Katz*, 533 U.S. 194, 201 (2001) ("[I]f a [constitutional] violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established."); *accord Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

"A [g]overnment official's conduct violates clearly established law when, at the time of the challenged conduct, [t]he contours of [a] right [are] sufficiently clear that every 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011) (quotation marks and citation omitted).

1    "[T]he right allegedly violated must be defined at the appropriate level of specificity
2    before a court can determine if it was clearly established." *Dunn v. Castro*, 621 F.3d
3    1196, 1201 (9th Cir. 2010).  However, courts "do not require a case directly on point, but
4    existing precedent must have placed the statutory or constitutional question beyond
5    debate." *al-Kidd*, 131 S. Ct. at 2083.

6         The law in the Ninth Circuit regarding video surveillance of the home has been
7    clearly established since at least 2000 when the court decided *Nerber*.  222 F.3d at 597.
8    *Nerber* made clear that "society is prepared to accept as reasonable [an] expectation to
9    be free from video surveillance [in a hotel room]." *Id.* at 604.  *Nerber* involved a hotel
10   room while this case involves Shafer's home, but for "Forth Amendment purposes, a
11   hotel room is treated essentially the same if not exactly the same as a home[.]" *Id.* at
12   600 n.2.  And as mentioned, the heightened constitutional protection in the home is a
13   central feature of the Fourth Amendment and has been since the nation's founding. *See*
14   *Kyllo*, 533 U.S. at 31.  Furthermore, the fact that the cameras at issue in *Nerber* were
15   hidden and the cameras here were in plain view is of no consequence.  First, *Nerber*
16   does not distinguish between hidden video cameras and video cameras in plain view,
17   nor does it rest its analysis on the fact that the cameras there were hidden.  Second,
18   Shafer did not know that the cameras in this case belonged to the government at the
19   time the cameras were filming him.  Before Fenyves installed the DHS cameras, he was
20   filming Shafer on his personal cameras.  The record demonstrates that Shafer did not
21   know that the DHS cameras Fenyves added to his surveillance system in February 2009
22   belonged to the government until long after Fenyves returned the cameras to the BCPD.
23   (*See* dkt. no. 28-5 at 20, 37.)  Therefore, the cameras were the equivalent of the hidden
24   cameras at issue in *Nerber* because the DHS cameras were in effect "hidden" among
25   Shafer's personal cameras.

26        Finally, Defendants argue that they are entitled to qualified immunity because
27   they believed their actions were constitutional.  At their depositions, both Chase and
28   Dubois stated that they did not believe they had violated Shafer's Fourth Amendment

rights.  (*See* dkt. nos. 28-1 at 19; 28-3 at 20.)   The Officers also testified that they believed they had acted reasonably in loaning Fenyves the DHS cameras.  (*See id.*) Notably, Officer Dubois' instruction to Fenyves not to film Shafer's window and both Officers' testimony regarding their general knowledge of the Fourth Amendment contradicts this point.[9]   The Officers should have known that filming a person's enclosed backyard, like filming the interior of a person's home, violates the Fourth Amendment. Even if the Officers truly believed their investigation was reasonable, "[w]hether the law was clearly established is an objective standard; the defendant's subjective understanding of the constitutionality of his or her conduct is irrelevant."   *Clairmont v. Sound Mental Health*, 632 F.3d 1091, 1109 (9th Cir. 2011).

Officers Chase and Dubois authorized loaning the DHS cameras to Fenyves.  Yet despite knowing the history of animosity between the two neighbors, Chase and Dubois did not follow up on the investigation with Fenyves.  They did not ensure that the cameras were not being used to film Shafer's home.  The Officers attempt to hide behind Fenyves' actions and use him almost as a shield against liability. They cannot.  Police officers cannot act through a private citizen to make certain conduct constitutional which would otherwise be unconstitutional if performed by the government.

Police officers act irresponsibly and unreasonably when they give a citizen surveillance cameras to spy on his neighbors on behalf of the police and fail to conduct a follow-up inquiry to ensure the cameras are not being used to conduct unreasonable search.  Qualified immunity cannot protect police officers from such behavior.

For these reasons, qualified immunity does not shield Defendants Chase and Dubois from liability.  And because Chase and Dubois' actions violated Shafer's Fourth Amendment rights, the Court grants Shafer's Motion for Summary Judgment on his

_____

[9]Officer Ford informing Fenyves that his camera was "not positioned properly" and her instruction that he take the DHS cameras down immediately (dkt. no. 30 at 25) also call into question Dubois' and Chase's assertions that they believed filming Shafer's backyard was constitutional.

1    Fourth Amendment claims against Defendants Chase and Dubois for authorizing

2    Fenyves' unconstitutional filming of Shafer's backyard.   Defendants' Motion regarding

3    these claims is accordingly denied.

4

5    **C.    Fourth Amendment Claims Against Defendant Chief Finn in His Individual Capacity**

6    **a.    Violation of a Constitutional Right**

7    In his Complaint, Shafer alleges that Chief Finn violated his Fourth Amendment

8    right by participating in the narcotics investigation.  However, Finn did not originally

9    authorize the investigation nor did he later become part of it.   Unlike Defendants Chase

10   and Dubois, Chief Finn was not personally involved in providing Fenyves with the DHS

11   cameras.   All parties agree that Chief Finn was out of town for training when Deputy

12   Chief Chase authorized the investigation.   So Finn, unlike Dubois and Chase, did not

13   directly violate Shafer's Fourth Amendment reasonable expectation of privacy.   Finn may

14   be liable, however, under a theory of deliberate indifference.

15   In *Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011), *cert. denied*, 132 S. Ct.

16   2101 (2012), the Ninth Circuit "reaffirmed that a plaintiff may state a claim under § 1983

17   against a supervisor for deliberate indifference."   *Henry A. v. Willden*, 678 F.3d 991,

18   1003 (9th Cir. 2012).   To be held liable under a theory of deliberate indifference, "the

19   supervisor need not be directly and personally involved in the same way as are the

20   individual officers who are on the scene inflicting constitutional injury."   *Baca*, 652 F.3d at

21   1205 (quotation marks and citations omitted).    A § 1983 suit cannot be based on

22   vicarious liability alone, but must allege that the defendant's own conduct violated the

23   plaintiff's civil rights.  *See City of Canton v. Harris*, 489 U.S. 378, 386 (1989).

24   In § 1983 lawsuits, "supervisors can be held liable for: (1) their own culpable

25   action or inaction in the training, supervision, or control of subordinates; (2) their

26   acquiescence in the complained-of constitutional deprivation; and (3) conduct that

27   showed a reckless or callous indifference to the rights of others."   *Cunningham v. Gates*,

28   229 F.3d 1271, 1292 (9th Cir. 2000).  Further,

> [i]n limited circumstances a supervisor's subsequent "ratification" of another's conduct can form the basis for liability under § 1983. The decision to ratify specific conduct, however, must approve both the subordinate's decision and the basis for it, and the ratification decision must be the product of a conscious, affirmative, choice to ratify the conduct in question. It must be a decision to ratify unconstitutional conduct.

*Peschel v. City of Missoula*, 686 F. Supp. 2d 1092, 1102 (D. Mont. 2009). The circumstances must demonstrate that Chief Finn either "set in motion a series of acts by others[] or knowingly refused to terminate a series of acts by others, which he knew or reasonably should have known, would cause others to inflict the constitutional injury." *Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991) (citations omitted).

There are genuine issues of material fact regarding whether Chief Finn (1) approved of loaning the DHS cameras to Fenyves for the purpose of videotaping Shafer's home; and (2) made a conscious, affirmative decision to ratify Chase and Dubois' unconstitutional investigation.

There is a great deal of evidence supporting Shafer's position that Chief Finn ratified an unlawful investigation. Chief Finn became aware of the investigation after his return from training. (Dkt. no. 30-7 at 12). At his deposition Chief Finn testified that he and Deputy Chase had several conversations regarding the BCPD loaning its DHS cameras to Fenyves. (*Id.*) He knew that BCPD had done so without a warrant. (*Id.* at 12, 13.) Once he found out about the operation, Chief Finn testified that he did not follow up on the investigation but that he knew that Deputy Chief Chase was involved in the project and had loaned Fenyves the DHS cameras to help the BCPD discern whether or not illicit narcotics-related activity was occurring at the Shafer residence. (*Id.* at 12-13.)

Despite this compelling evidence, it is not obvious from the record that Chief Finn knew that Fenyves was pointing the DHS cameras at Shafer's property and not at either Fenyves' own property or the sidewalk and street surrounding the Fenyves and Shafer residences. Chief Finn testified that he knew that the BCPD lent its cameras to Fenyves to protect and monitor Fenyves' own property as well as to help the Police Department

1    investigate the allegations concerning Shafer.  (Dkt. no. 30-7 at 11.)  Finn stated that he

2    knew that Fenyves was aiming the cameras at Fenyves' property and at the border of his

3    property.  (*Id.*)  At his deposition, Finn testified that he did not know if the BCPD verified

4    the direction in which Fenyves was aiming the cameras.  (*Id.* at 11, 13.)  Therefore, a

5    reasonable juror could conclude that Chief Finn did not ratify the unlawful videotaping of

6    Shafer's bathroom window and backyard, but rather the lawful videotaping of Fenyves'

7    own property and the public sidewalk and street surrounding it.

8         The Court accordingly denies both Motions for Summary Judgment on this claim.

9                        **b.    Qualified Immunity**

10        For the same reasons stated above regarding Defendants Chase and Dubois,

11   Chief Finn's qualified immunity defense fails.   The law regarding government video

12   surveillance of citizens' homes was clearly established at the time of the violation.

13   Defendant Finn cannot raise the defense of qualified immunity, and his Motion regarding

14   this affirmative defense is accordingly denied.  Plaintiff's Motion for Summary Judgment

15   regarding Chief Finn's qualified immunity defense is therefore granted.

16        **D.    *Monell* Claims Against BCPD and COBC**[10]

17        Shafer argues that the unconstitutional video surveillance of his home was part of

18   an official policy or custom of the BCPD and the COBC because Chief Finn ratified the

19   surveillance and allowed it to continue for fifty-six days.[11]  (Dkt. no. 29 at 22-23.)

20   ///

21

22   _____

23        [10]Shafer's claims against the Officer Defendants in their official capacity are
     considered one and the same as his claims against BCPD and the City, because "[a]s
     long as the government entity receives notice and an opportunity to respond, an official-
24   capacity suit is, in all respects other than name, to be treated as a suit against the
     entity."  *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).

25        [11]In his Complaint, Shafer also alleges that BCPD and the City inadequately
26   supervised and failed to train its police officers, "thereby failing to adequately discourage
     further constitutional violations on the part of its police officers."  (Dkt. no. 1 at ¶ 87.)
27   However, Shafer does not discuss this allegation in his Motion nor does he provide
     sufficient facts to support this argument.  Therefore, Defendants' Motion for Summary
28   Judgment regarding Shafer's failure to train/failure to supervise claim is granted.

"Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort."  *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 691 (1978).  *Monell* instructs that in order to impose liability on a municipality or a subdivision of the municipality under § 1983, a plaintiff must "identify a municipal 'policy' or 'custom' that caused the plaintiff's injury." *Bd. of Cnty. Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 403 (1997). "Locating a 'policy' ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality."  *Id.* at 403-04 (citations omitted).   "Similarly, an act performed pursuant to a 'custom' that has not been formally approved by an appropriate decision maker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law."[12] *Id.* at 404 (citations omitted).

Defendants, citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808 (1985), argue that a single incident is not sufficient to establish a municipal policy for the purposes of § 1983.  (Dkt. no. 30 at 16.)  However, in *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988), the court held that a single event *can* give rise to municipal liability under § 1983:

> We [the court] have assumed that an unconstitutional governmental policy could be inferred from a single decision taken by the highest official responsible for setting policy in that area of the government's business . . . . At the other end of the spectrum, we have held [in *Tuttle*] that an unjustified shooting by a police officer cannot, without more, be thought to result from official policy.  (citations omitted).

///

---

[12]Although Shafer alleges that the surveillance of his home was part of an unconstitutional custom or practice perpetuated by COBC and BCPD, his Motion for Summary Judgment focuses on his argument that there existed an unconstitutional city policy.  Moreover, there is no evidence that BCPD or COBC had a custom of initiating round-the-clock video surveillance of suspected criminals.  This Order therefore focuses on Shafer's *Monell* allegations regarding an unconstitutional city or police department policy.

1    In fact, in *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81 (1986), "the

2    Supreme Court held that a single decision by a municipal policymaker may be sufficient

3    to trigger section 1983 liability under *Monell*, even though the decision is not intended to

4    govern future situations."  *Gillette v. Delmore*, 979 F.2d 1342, 1347 (citing *Pembaur*, 475

5    U.S. at 480-81 (remaining citations omitted)).  "There must, however, be evidence of a

6    conscious, affirmative choice."  *Id.*  "Municipal liability under section 1983 attaches only

7    where a deliberate choice to follow a course of action is made from among various

8    alternatives by the official or officials responsible for establishing final policy with respect

9    to the subject matter in question."  *Id.* at 1348 (quotation marks and citations omitted).

10   "Likewise, *Praprotnik* requires that a policymaker approve a subordinate's decision *and*

11   *the basis for it* before the policymaker will be deemed to have ratified the subordinate's

12   discretionary decision" for the purposes of municipal liability under § 1983.  *Id.* at 1348

13   (italics in original; citation omitted).  This is because to "hold cities liable under section

14   1983 whenever policymakers fail to overrule the unconstitutional discretionary acts of

15   subordinates would simply smuggle *respondeat superior* liability into section 1983 law

16   under the guise of *Pembaur's* 'single decision' rule."  *Id.*

17   Therefore, to hold BCPD, and by extension Boulder City, liable under *Monell*, the

18   Court must determine whether (1) Chief Finn was a policymaking official with final

19   policymaking authority, and (2) Chief Finn ratified the video surveillance of Plaintiff's

20   home.[13]  Because the Court has determined that there is a genuine issue of material fact

21   regarding whether Chief Finn ratified the video surveillance of Shafer's home, both

22   Motions are denied.

23   ///

24   ///

25

26   _____

27   [13]For the purposes of *Monell* liability under § 1983, Shafer's claims against the BCPD are identical to his claims against Boulder City. *See Howlett By & Through Howlett v. Rose*, 496 U.S. 356, 376 (1990) ("[M]unicipal corporations and similar

28   governmental entities" are juridical persons who may be sued pursuant to § 1983).

1
2  **V.    CROSS-MOTIONS FOR SUMMARY JUDGMENT ON PLAINTIFF'S STATE LAW CLAIMS**

3         The Court will next consider summary judgment raised with respect to Shafer's

4  state law claims.

5         **A.    The Applicability of Discretionary-Function Immunity in this Action**

6         Although Nevada has generally waived its state immunity under NRS § 41.031,

7  the State has retained immunity under NRS § 41.032 for officials exercising discretion.

8  NRS § 41.032(2) states no actions may be brought against an officer of the State or its

9  political subdivision that is "[b]ased upon the exercise or performance or the failure to

10 exercise or perform a discretionary function or duty" of the officer.   On its face, this

11 statute does not immunize municipal governments or their employees because

12 municipalities are considered independent corporations or "persons" with their own

13 identities, not mere political subdivisions of a state.  *See Monell*, 436 U.S. at 690.  The

14 Nevada Supreme Court, however, has implicitly assumed that municipalities are political

15 subdivisions of the State for the purposes of applying the discretionary act immunity

16 statute.  *See, e.g. Travelers Hotel, Ltd. v. City of Reno*, 741 P.2d 1353, 1354-55 (Nev.

17 1987).

18        In determining whether immunity applies under NRS § 41.032, the Nevada

19 Supreme Court has adopted the general principles of federal jurisprudence as to

20 discretionary-function immunity, holding that the actions of state officers are entitled to

21 discretionary-function immunity if their decision (1) involves an element of individual

22 judgment or choice and (2) is based on considerations of social, economic, or political

23 policy.  *Martinez v. Maruszczak*, 168 P.3d 720, 727, 729 (Nev. 2007).  Decisions at all

24 levels of government, including routine decisions, may be protected by discretionary-

25 function immunity so long as both criteria are satisfied.  *Id.* at 729. Additionally, "the

26 discretionary function exception protects agency decisions concerning the scope and

27 manner in which [the agency] conducts an investigation so long as the agency does not

28 violate a mandatory directive."   *Vickers v. United States*, 228 F.3d 944, 951 (9th Cir.

24

1   2000).  In analyzing discretionary-function immunity, a court does not ask whether the

2   official abused his or her discretion, but only whether the acts concerned a matter in

3   which the official had discretion.  *See* NRS § 41.032(2).

4        Shafer admits that Deputy Chase's decision to initiate a narcotics-related

5   investigation was a discretionary choice relating to social and political policy.  However,

6   he argues that the individual police officers' operational decisions implementing that

7   investigation did not involve policy considerations.  (Dkt. no. 29 at 24.)

8              **1.     Officer Dubois and Deputy Chief Chase**

9        "A law enforcement officer is generally afforded discretionary-function immunity in

10  conducting an investigation and effectuating an arrest so long as the officer does not

11  violate a mandatory directive in doing so."  *Sandoval v. Las Vegas Metro. Police Dept.*,

12  __ F. Supp. 2d __, No. 2:10-cv-1196, 2012 WL 607283, at *14 (D. Nev. Feb. 24, 2012)

13  (*citing Hart v. United States*, 630 F.3d 1085, 1090 (8th Cir. 2011) ("We readily conclude

14  a federal law enforcement officer's on-the-spot decisions concerning how to effectuate

15  an arrest – including how best to restrain, supervise, control or trust an arrestee – fall

16  within the discretionary function exception to the FTCA absent a specific mandatory

17  directive to the contrary.") (other citations omitted)).

18       "However, acts which violate the Constitution are not discretionary."  *Jarvis v. City*

19  *of Mesquite Police Dept.*, No. 09-CV-00851, 2012 WL 600804, at *5 (D. Nev. Feb. 23,

20  2012) (citing *Nurse v. United States*, 226 F.3d 996, 1002 (9th Cir.2000) ("In general,

21  governmental conduct cannot be discretionary if it violates a legal mandate."); *see also*

22  *U.S. Fid. & Guar. Co. v. United States*, 837 F.2d 116, 120 (3d Cir. 1988) (stating that

23  "conduct cannot be discretionary if it violates the Constitution, a statute, or an applicable

24  regulation" because federal officials "do not possess discretion to violate constitutional

25  rights or federal statutes").  Accordingly, because Chase and Dubois' actions clearly

26  violated the Fourth Amendment, discretionary-function immunity does not apply to

27  Shafer's state law claims against them.

28  ///

1

## 2.      Chief Finn, BCPD, and Boulder City

2       The BCPD is not a suable entity because it is a department of Boulder City, not a

3   political subdivision. *See Wayment v. Holmes*, 912 P.2d 816, 819 (Nev. 1996).

4   However, Boulder City is a suable entity unless discretionary-function immunity applies.

5   *See id.*

6       Boulder City and Chief Finn do not enjoy discretionary-function immunity. In

7   *Trujillo v. Powell*, No. 3:11-cv-00360, 2011 WL 3419504, at *9 n.3 (D. Nev. August 2,

8   2011), a Nevada district court applied *respondeat superior* liability in the context of

9   discretionary-function immunity.  Noting that vicarious liability is not available in § 1983

10   claims, the court nevertheless held that because *respondeat superior* is a "valid theory of

11   liability against a government employer as to common law torts," it is applicable in the

12   realm of discretionary-function immunity.  *Id.*  Under a theory of *respondeat superior*,

13   Defendants Chase and Dubois' unconstitutional decision to authorize the use of the DHS

14   cameras to conduct a search of Shafer's home can be imputed to their supervisor and

15   the City.[14]  *See id.*

16       For these reasons, only Defendant BCPD is immune from suit from Shafer's state

17   law claims.  Defendants' Motion for Summary Judgment relating to Shafer's state law

18   claims against the BCPD is therefore granted. Defendants' Motion for Summary

19   Judgment regarding their discretionary-function immunity defense as to all other

20   Defendants is denied and Shafer's Motion in that regard is granted.

21       The remaining discussion relates to Shafer's state law claims against all

22   Defendants except for the BCPD.

23   ///

24

25       [14]"*Respondeat superior* liability is statutorily precluded in Nevada only in cases
26   where the employee's conduct '[w]as a truly independent venture of the employee; [w]as
   not committed in the course of the very task assigned to the employee; and [w]as not
27   reasonably foreseeable under the facts and circumstances of the case considering the
   nature and scope of his employment.[']" *Trujillo*, 2011 WL 3419504, at *9 n.3 (citing NRS
28   § 41.745(1)(a)-(c)). This exception does not apply in this case.

1

### B.   Civil Conspiracy

To state a valid claim for civil conspiracy, a plaintiff must show: (1) defendants, by acting in concert, intended to accomplish an unlawful objective for the purpose of harming the plaintiff; and (2) the plaintiff sustained damages as a result.  *Hilton Hotels Corp. v. Butch Lewis Prods., Inc.*, 862 P.2d 1207, 1210 (Nev. 1993) (citing *Collins v. Union Fed. Savings & Loan*, 662 P.2d 610, 622 (Nev. 1983)).

"A civil conspiracy claim operates to extend, beyond the active wrongdoer, liability in tort to actors who have merely assisted, encouraged or planned the wrongdoer's acts."  *Flowers v. Carville*, 266 F. Supp. 2d 1245, 1249 (D. Nev. 2003) (quoting 16 Am. Jur. 2D Conspiracy § 57 (1998)).  "While the essence of the crime of conspiracy is the agreement, the essence of civil conspiracy is damages."  *Id.*  The damages result from the tort underlying the conspiracy.  *Id.*  An actionable civil conspiracy "consists of a combination of two or more persons who, by some concerted action, intend to accomplish an unlawful objective for the purpose of harming another, and damage results from the act or acts."  *Consol. Generator-Nevada v. Cummins Engine Co.*, 971 P.2d 1251, 1256 (Nev. 1998) (quoting *Hilton Hotels Corp.*, 862 P.2d at 1210; *see also Sutherland v. Gross*, 772 P.2d 1287 (Nev. 1989).

Here, the parties dispute whether the Officer Defendants wanted Fenyves to videotape his own home or Shafer's home.  For the purpose of this claim, it is relevant that in his deposition, Fenyves stated that he received no direction regarding the placement or directioning of the DHS cameras.  (Dkt. no. 29-6 at 8-10.)  Yet Officer Dubois testified that he informed Fenyves it would "be okay" to film Shafer's backyard.  (Dkt. no. 30-5 at 9.)  This produces a genuine issue of material fact, because if Deputy Chief Chase, Detective Dubois, and Fenyves agreed that Fenyves would aim the cameras at Shafer's residence, then Shafer would satisfy the first element of his civil conspiracy claim – that Defendants intended to work together to unlawfully violate Shafer's Fourth Amendment right to be free from an unreasonable search.  However, if the Officers and Fenyves were not in agreement that Fenyves would tape Shafer's

1  backyard, then Shafer could not demonstrate either action in concert or a shared intent
2  to violate his Fourth Amendment right.  The Court therefore denies the parties' Motions
3  for Summary Judgment on this claim.

4          **C.     Slander Against Defendant Mayor Tobler**

5          Shafer claims that at the Town Hall meeting regarding the alleged drug dealing at
6  Shafer's residence, Mayor Tolber stated that "he wouldn't want to live next to that
7  [referring to Shafer] either."

8          **1.     Legal Standard**

9          To establish a prima facie case of defamation, a plaintiff must allege: (1) a false
10  and defamatory statement by the defendant concerning the plaintiff; (2) an unprivileged
11  publication to a third person; (3) fault, amounting to at least negligence; and (4) actual or
12  presumed damages. *Wynn v. Smith*, 16 P.3d 424, 427 (Nev. 2001).  A statement is
13  defamatory only if it contains a factual assertion that can be proven false. *Pacquiao v.*
14  *Mayweather,* 803 F. Supp. 2d 1208, 1211 (D. Nev. 2011).

15          Defamation is a question of law.  *Branda v. Sanford*, 97 Nev. 643, 637 P.2d 1223,
16  1225-26 (Nev. 1981).  "In reviewing an allegedly defamatory statement, the words must
17  be viewed in their entirety and in context to determine whether they are susceptible of a
18  defamatory meaning." *Lubin v. Kunin*, 17 P.3d 422, 425-26 (Nev. 2001) (internal
19  quotations omitted).  As a general rule, "only assertions of fact, not opinion, can be
20  defamatory. However, expressions of opinion may suggest that the speaker knows
21  certain facts to be true or may imply that facts exist which will be sufficient to render the
22  message defamatory if false." *Wynn*, 16 P.3d at 431 (citing *K-Mart Corporation v.*
23  *Washington*, 109 Nev. 1180, 866 P.2d 274, 281 (Nev. 1993)). Further, "statements of
24  belief are defamatory if they imply the existence of defamatory facts that are not
25  disclosed to the listener . . . for example, the statement 'I think he must be an alcoholic'
26  is actionable because a jury might find that it implied that the speaker knew undisclosed
27  facts justifying his opinion."  Restatement (Second) Torts, § 556; *see also Gordon v.*
28  ///

1   *Dalrymple*, 2008 WL 2782914, at *4 (D. Nev. July 8, 2008) ("Any statement which
2   presupposes defamatory facts unknown to the interpreter is defamatory.").

3       In Nevada, to determine if a statement is one of fact or opinion, "the court must
4   ask whether a reasonable person would be likely to understand the remark as an
5   expression of the source's opinion or as a statement of existing fact." *Pegasus v. Reno*
6   *Newspapers, Inc.*, 57 P.3d 82, 87 (Nev. 2002); *see also Wynn*, 16 P.3d at 431. If a
7   statement is susceptible to different constructions, resolution of any ambiguity is a
8   question of fact for the jury. *Pacquiao*, 803 F. Supp. 2d at 1212.

9                   **2.    Discussion**

10      There is a genuine issue of material fact regarding element one, whether Mayor
11  Tobler made a false and defamatory statement concerning Shafer.  Elements two and
12  three – publication and fault – have been clearly established by the facts provided in the
13  summary judgment record.

14      A portion of Tobler's statement is clearly an opinion: Mayor Tobler stated his
15  preference, or opinion, that he would not like to live next to Shafer.  However, there is a
16  genuine issue of material fact as to whether the second half of Mayor Tobler's statement
17  was an expression of an opinion that implied certain facts exist which would render
18  Tobler's statement defamatory if false.  *See Wynn*, 16 P.3d at 431.  Mayor Tobler said "I
19  wouldn't want to live next to *that* either."  It is unclear what Tobler meant by "that."  He
20  surely meant Shafer – but what exactly about Shafer is unclear.  "That" could have
21  meant the fact that Shafer's home was noisy and had a great deal of traffic late at night.
22  These facts are stipulated as true by all parties and, therefore, Shafer would have no
23  defamation claim if those were the facts implied by Tobler's statement.  If, however,
24  Mayor Tobler was insinuating that he would not want to live next to a narcotics dealer,
25  and Shafer convinces a jury that he was not dealing narcotics during the relevant time
26  period, then a jury could find that Mayor Tobler was implying that Shafer was a drug
27  dealer.  Such a statement would certainly be defamatory if false. For this reason,
28  Defendants' Motion on Shafer's defamation claim is denied.

### D.    Remaining State Law Claims

The parties do not present clear argument as to why summary judgment should be granted in their favor on these claims.  Their briefs fail to cite to sufficient case law or evidence demonstrating why these causes of action should be decided as a matter of law.  Therefore, the Motions for Summary Judgment on the state law claims not explicitly discussed above are denied.

### E.    Punitive Damages

Defendants move for summary judgment on Shafer's request for punitive damages for both his federal and state law claims.[15]

#### 1.    Federal Claims

A plaintiff may claim punitive damages under § 1983 when "the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."  *Smith v. Wade*, 461 U.S. 30, 56 (1983).

Defendants argue that Shafer is not entitled to federal punitive damages because there is "no evidence that the Officer Defendants intentionally harmed Plaintiff." However, as discussed above, this is not the case for Officers Chase and Dubois.  The two Officers knew Fenyves would use the DHS cameras to film Shafer's backyard. Moreover, as described above, there is a genuine issue of material fact regarding whether Chief Finn and the City acted with intent or reckless disregard.

Shafer's Motion for Summary Judgment on his federal punitive damages also fails.  Shafer has failed to properly brief the meaning of "evil motive or intent" or "reckless or callous indifference" in the context of punitive damages under § 1983.

///

---

[15]Municipalities are immune from punitive damages under 42 U.S.C. § 1983.  *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981).  As such, the Court's discussion of federal punitive damages relates to Shafer's claims against the Officer Defendants in their individual capacities only.

1    Accordingly, the Court declines to grant summary judgment for either party on

2    Shafer's request for punitive damages on his federal claims.

3    **2.    State Claims**

4    Defendants cite to NRS § 41.035, arguing that the statute limits the amount a

5    plaintiff may obtain in a tort action against a political subdivision.   However, NRS §

6    41.035 merely limits the total amount of damages, including but not limited to punitive

7    damages, that a plaintiff may recover against an officer of the state or political

8    subdivision.   These damages are capped at $100,000.   NRS § 41.035(1).   Therefore,

9    NRS § 41.035 may be grounds for limiting the amount of damages Shafer seeks.   This

10   will be addressed at trial.   NRS § 41.035 does not immunize Defendants from punitive

11   damages arising out of Plaintiff's state law allegations, nor do Defendants provide any

12   other reason why the Court should grant them summary judgment on this issue.   The

13   Motion is accordingly denied.

14   Shafer fails to provide legal argument regarding why he should be granted

15   summary judgment on his request for punitive damages on his state law claims.   His

16   references to punitive damages for those claims are vague at best.   (*See, e.g.* dkt. no.

17   29 at 25-26).   The Court therefore denies his request.

18   **VI.    CONCLUSION**

19   Accordingly, IT IS HEREBY ORDERED that the parties' Motions for Summary

20   Judgment are GRANTED in part and DENIED in part as follows:

21   - Plaintiff's Motion for Summary Judgment on his Fourth Amendment claims

22   against Defendants Chase and Dubois in their individual capacities regarding

23   Fenyves' videotaping his backyard is GRANTED; to the extent that Plaintiff's

24   Motion relates to Fenyves' filming his bathroom window, the Motion is

25   DENIED;

26   - Defendants' Motion for Summary Judgment on Plaintiff's Fourth Amendment

27   claims against Defendants Chase and Dubois in their individual capacities is

28   DENIED;

- Plaintiff's Motion for Summary Judgment regarding Defendants Chase and Dubois' affirmative defense of qualified immunity is GRANTED;

- Defendants' Motion for Summary Judgment regarding Officers Chase and Dubois' affirmative defense of qualified immunity is DENIED;

- Both parties' Motions for Summary Judgment on Plaintiff's Fourth Amendment claim against Defendant Finn in his individual capacity are DENIED;

- Plaintiff's Motion for Summary Judgment regarding Defendant Finn's affirmative defense of qualified immunity is GRANTED;

- Defendants' Motion for Summary Judgment regarding Defendant Finn's affirmative defense of qualified immunity is DENIED;

- Plaintiff's Motion for Summary Judgment regarding his claims against the BCPD Officers acting in their official capacities is DENIED;

- Defendants' Motion for Summary Judgment regarding Plaintiff's claims against the BCPD Officers acting in their official capacities is GRANTED;

- Both parties' Motions for Summary Judgment on Plaintiff's *Monell* claims against BCPD and Boulder City are DENIED, except that Defendants' Motion for Summary Judgment regarding Plaintiff's failure to train/failure to supervise *Monell* allegations is GRANTED;

- Defendants' Motion for Summary Judgment regarding Plaintiff's state law claims against BCPD is GRANTED;

- Defendants' Motion for Summary Judgment regarding Defendants' discretionary-function immunity defense is DENIED and Plaintiff's Motion for Summary Judgment on that defense is therefore GRANTED;

- The parties' Motions for Summary Judgment regarding Plaintiff's civil conspiracy cause of action as to all Defendants except BCPD are both DENIED;

- Defendants' Motion for Summary Judgment regarding Plaintiff's slander cause of action against Mayor Tobler is DENIED;

- The parties' Motions for Summary Judgment regarding Plaintiff's unreasonable intrusion on the solitude or seclusion of another cause of action as to all Defendants except BCPD are both DENIED;
- The parties' Motions for Summary Judgment regarding Plaintiff's negligence cause of action as to all Defendants except BCPD are both DENIED;
- Defendants' Motion for Summary Judgment regarding Plaintiff's intentional infliction of emotional distress cause of action as to all Defendants except BCPD is DENIED;
- Defendants' Motion for Summary Judgment regarding Plaintiffs' negligent infliction of emotional distress cause of action as to all Defendants except BCPD is DENIED;
- Both parties' Motions for Summary Judgment regarding state and federal punitive damages are DENIED.

ENTERED THIS 12th day of September 2012.

_____

UNITED STATES DISTRICT JUDGE